# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE No.: | 2014AP2701-CR |
| COMPLETE TITLE: | State of Wisconsin, Plaintiff-Respondent, v. Robert Joseph Stietz, Defendant-Appellant-Petitioner. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 369 Wis. 2d 222, 880 N.W.2d 182
(2016 – Unpublished)

| | |
|---|---|
| OPINION FILED: | June 13, 2017 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | February 15, 2017 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Lafayette |
| JUDGE: | James R. Beer |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | R.G. BRADLEY, J. concurs, joined by ROGGENSACK, C.J. (except part II) and KELLY, J. |
| DISSENTED: | ZIEGLER, J. dissents, joined by GABLEMAN, J. |
| NOT PARTICIPATING: | A.W. BRADLEY, J. did not participate. |

ATTORNEYS:

For the plaintiff-respondent there was a brief filed by and an oral argument by *Sarah Lynn Shaeffer*, assistant attorney general, with whom on the brief was *Brad D. Schimel*, attorney general.

For the defendant-appellant-petitioner, there were briefs filed by *Charles W. Giesen* and *Jessica J. Giesen* and *Giesen Law Offices, S. C.*, Madison, and oral argument by *Charles W. Giesen.*

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.   2014AP2701-CR
(L.C. No.  2012CF93)

STATE OF WISCONSIN                    :        IN SUPREME COURT

**State of Wisconsin,**

   **Plaintiff-Respondent,**

 **v.**

**Robert Joseph Stietz,**

   **Defendant-Appellant-Petitioner.**

**FILED**

**JUN 13, 2017**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals.  *Reversed and cause remanded.*

¶1   SHIRLEY S. ABRAHAMSON, J.[1]   This is a review of an unpublished per curiam decision of the court of appeals

---

[1] Four justices——Justice Rebecca Bradley, Chief Justice Patience D. Roggensack and Justice Daniel Kelly (both of whom join Justice Rebecca Bradley's concurrence), and I——join this opinion holding that the decision of the court of appeals is reversed and that the circuit court erred in failing to instruct the jury regarding self-defense.  Justice Daniel Kelly joins this opinion to the extent that it is not inconsistent with Justice Rebecca Bradley's concurrence.

(continued)

affirming the judgment of conviction by the circuit court for Lafayette County, James R. Beer, Judge.[2]  The criminal charges arose out of a confrontation between the defendant and two Wisconsin Department of Natural Resources conservation wardens, Joseph Frost and Nick Webster.

¶2  Following a three-day trial, a jury convicted Robert Stietz, the defendant, of resisting a law enforcement officer,

---

With regard to the trespass issue, Justice Rebecca G. Bradley's concurrence is joined by Chief Justice Patience D. Roggensack except for Section II and is joined by Justice Daniel Kelly in full.  The concurrence would on remand "require the circuit court to instruct the jury on trespass" but does "not decide whether the language in Stietz's proposed trespass instruction was appropriate."  This aspect of Justice Rebecca G. Bradley's concurrence has not garnered a majority of the justices participating in the instant case.

Justice Annette K. Ziegler is joined by Justice Michael J. Gableman in dissent.

Justice Ann Walsh Bradley did not participate.

[2] State v. Stietz, No. 2014AP2701-CR, unpublished slip op. (Wis. Ct. App. Apr. 14, 2016).

Wis. Stat. § 946.41(1) (2013-14),[3] and intentionally pointing a firearm at an officer, § 941.20(1m)(b).[4]

¶3 On appeal, the court of appeals rejected the defendant's argument that his constitutional right to present a defense was denied by the circuit court's refusal to instruct the jury on self-defense. The court of appeals affirmed the judgment of conviction.

¶4 The dispositive issue presented is whether the circuit court erred when it refused to instruct the jury on self-defense

---

[3] All subsequent references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated.

[4] The jury found the defendant guilty of two of the following six offenses charged: (1) first-degree recklessly endangering safety (Wis. Stat. § 941.30(1)); (2) resisting or obstructing an officer (Warden Frost), use of a dangerous weapon (Wis. Stat. §§ 946.41, 939.63(1)); (3) resisting or obstructing an officer (Warden Webster), use of a dangerous weapon (Wis. Stat. §§ 946.41, 939.63(1)); (4) negligent handling of a weapon (Wis. Stat. § 941.20(1); (5) intentionally pointing a firearm at a law-enforcement officer (Warden Frost) (Wis. Stat. § 941.20(1m)(b); (6) intentionally pointing a firearm at a law-enforcement officer (Warden Webster) (Wis. Stat. § 941.20(1m)(b)).

The defendant filed a postconviction motion that was denied.

The defendant's sentence included one year of initial confinement and three years of extended supervision on the felony and a consecutive two-year probation term on the misdemeanor. The defendant had served the confinement portion of his sentence by the time his brief was filed in this court, but he remained subject to extended supervision, probation, and loss of civil rights.

3

as the defendant requested.[5] The dispute in the instant case regarding the self-defense instruction centers on whether the defense of self-defense is supported by sufficient evidence. State v. Head, 2002 WI 99, ¶113, 255 Wis. 2d 194, 648 N.W.2d 413.

¶5 On viewing the record in the light most favorable to the defendant, as we must,[6] we conclude, contrary to the State's position, that there was adequate evidence supporting a self-defense instruction in the instant case and that the circuit court erred in refusing the defendant's request for the instruction.

¶6 The evidence was sufficient in the instant case because a reasonable fact-finder could have determined that the defendant reasonably believed that the two men who accosted him

---

[5] We need not and do not address the following issues that the parties addressed:

Did the law enforcement officers violate the defendant's Second Amendment rights when they forcibly disarmed the defendant of his loaded rifle?

Did the defendant have the right to argue and instruct the jury that the law enforcement officers who encountered the defendant on his uncle's property were trespassers?

Did the court of appeals contradict State v. Hobson, 218 Wis. 2d 350, 577 N.W.2d 825 (1998), by foreclosing a self-defense claim against the wardens, whom the defendant did not know were officers and who were not claiming to arrest the defendant but were trying to disarm him?

[6] State v. Head, 2002 WI 99, ¶¶9, 113, 255 Wis. 2d 194, 648 N.W.2d 413.

with weapons on his land and on land upon which he had an easement were not wardens with the Wisconsin Department of Natural Resources; that the defendant reasonably believed that the two men were trespassers hunting illegally; that because the two men forcibly wrested his rifle from him and then drew their handguns on him, the defendant reasonably believed that the two men were unlawfully interfering with his person; that the two men pointing handguns at the defendant caused him to fear for his life; and that the defendant pointed his handgun at the two men believing he had to defend himself.[7] In sum, the jury could conclude that the defendant threatened to use force as he reasonably believed necessary to prevent or terminate the interference with his person.

¶7 Because we conclude that there was sufficient evidence to support the privilege of self-defense, we conclude that the circuit court erred in failing to instruct the jury on self-defense as requested by the defendant. We further conclude that the circuit court's error affected the defendant's substantial rights; it was not harmless error.

¶8 Accordingly, we reverse the decision of the court of appeals and the judgment of conviction. We remand the cause to the circuit court for a new trial.

---

[7] Intentionally pointing a firearm toward or at another threatens use of force. State v. Watkins, 2002 WI 101, ¶56, 255 Wis. 2d 265, 647 N.W.2d 244.

5

¶9 We begin with a discussion of the statutory defense of self-defense and the standard of review. We then examine the record. We determine that there was sufficient evidence to support a jury instruction on self-defense and that the circuit court erred in refusing to give the instruction. Lastly, we assess the error and conclude that the circuit court's error in refusing to instruct the jury on self-defense affected the defendant's substantial rights.

I

¶10 The defendant raised an affirmative defense of self-defense. The privilege of self-defense is set forth in Wis. Stat. § 939.48(1) as follows:

> A person is privileged to threaten or intentionally use force against another for the purpose of preventing or terminating what the person reasonably believes to be an unlawful interference with his or her person by such other person. The actor may intentionally use only such force or threat thereof as the actor reasonably believes is necessary to prevent or terminate the interference. The actor may not intentionally use force which is intended or likely to cause death or great bodily harm unless the actor reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself. (Emphasis added.)

6

¶11  The pattern jury instruction for self-defense, Wis JI—
—Criminal 800,[8] instructs the jury on the elements of self-
defense as follows (footnotes omitted):

**Self-Defense**

Self-defense is an issue in this case.  The law of
self-defense allows the defendant to threaten or
intentionally use force against another only if:

- the defendant believed that there was an actual or
  imminent unlawful interference with the defendant's
  person; and,

- the defendant believed that the amount of force the
  defendant used or threatened to use was necessary to
  prevent or terminate the interference; and

- the defendant's beliefs were reasonable.

**Determining Whether Beliefs Were Reasonable**

A belief may be reasonable even though mistaken.[9] In
determining whether the defendant's beliefs were
reasonable, the standard is what a person of ordinary
intelligence and prudence would have believed in the
defendant's position under the circumstances that
existed at the time of the alleged offense.  The
reasonableness of the defendant's beliefs must be
determined from the standpoint of the defendant at the
time of the defendant's acts and not from the
viewpoint of the jury now.

---

[8] The defendant also requested Wis JI——Criminal 810,
relating to whether the defendant had to retreat, and also
proposed adaptations of these pattern instructions.  We need not
consider those formulations because we conclude that the record
supports the defendant's request for this pattern jury
instruction.

[9] See Maichle v. Jonovic, 69 Wis. 2d 622, 628, 230
N.W.2d 789 (1975) ("The reasonableness of the actor's beliefs,
moreover, is not defeated by a subsequent determination that his
beliefs were mistaken.").

¶12 A circuit court has broad discretion in deciding whether to give a requested jury instruction. State v. Coleman, 206 Wis. 2d 199, 212, 556 N.W.2d 701 (1996).[10] The circuit court must, however, exercise its discretion in order "to fully and fairly inform the jury of the rules of law applicable to the case and to assist the jury in making a reasonable analysis of the evidence." State v. Vick, 104 Wis. 2d 678, 690, 312 N.W.2d 489 (1981) (quoting State v. Dix, 86 Wis. 2d 474, 486, 273 N.W.2d 250 (1979)).

¶13 A court must determine whether a reasonable construction of the evidence will support the defendant's theory "viewed in the most favorable light it will 'reasonably admit from the standpoint of the accused.'" Head, 255 Wis. 2d 194, ¶113 (quoting State v. Mendoza, 80 Wis. 2d 122, 153, 258 N.W.2d 260 (1977) (quoting Ross v. State, 61 Wis. 2d 160, 172, 211 N.W.2d 827 (1973))).

¶14 Whether there are sufficient facts to warrant the circuit court's instructing the jury on self-defense is a question of law that this court decides independently of the circuit court and court of appeals, but benefiting from their

---

[10] "[A] criminal defendant is entitled to a jury instruction on a theory of defense if: (1) the defense relates to a legal theory of a defense, as opposed to an interpretation of evidence; (2) the request is timely made; (3) the defense is not adequately covered by other instructions; and (4) the defense is supported by sufficient evidence." State v. Coleman, 206 Wis. 2d 199, 212-13, 556 N.W.2d 701 (1996) (internal citations omitted); Johnson v. State, 85 Wis. 2d 22, 28-29, 270 N.W.2d 153 (1978).

analyses. Head, 255 Wis. 2d 194, ¶44 (citing State v. Mayhall, 195 Wis. 2d 53, 57, 535 N.W.2d 473 (1995)); State v. Sartin, 200 Wis. 2d 47, 53, 546 N.W.2d 449 (1996); State v. Chew, 2014 WI App 116, ¶7, 358 Wis. 2d 368, 856 N.W.2d 541.

¶15 A jury must be instructed on self-defense when a reasonable jury could find that a prudent person in the position of the defendant under the circumstances existing at the time of the incident could believe that he was exercising the privilege of self-defense. A circuit court may deny a requested self-defense instruction when no reasonable basis exists for the defendant's belief that another person was unlawfully interfering with his person and that the defendant used or threatened the use of such force as he reasonably believed necessary to prevent or terminate the interference. Head, 255 Wis. 2d 194, ¶¶112-113.

¶16 Wisconsin law establishes a "low bar" that the accused must surmount to be entitled to a jury instruction on the privilege of self-defense. State v. Schmidt, 2012 WI App 113, ¶12, 344 Wis. 2d 336, 824 N.W.2d 839. The accused need produce only "some evidence" in support of the privilege of self-defense. Head, 255 Wis. 2d 194, ¶112; State v. Peters, 2002 WI App 243, ¶¶21-23, 27-29, nn.4-5, 258 Wis. 2d 148, 653 N.W.2d 300.[11]

---

[11] The evidence may be facts presented by the defense or the State or through cross-examination. Coleman, 206 Wis. 2d at 214.

9

¶17 Evidence satisfies the "some evidence" quantum of evidence even if it is "weak, insufficient, inconsistent, or of doubtful credibility" or "slight."[12]

¶18 Crucial to applying the "some evidence" standard is that a court is not to weigh the evidence. State v. Mendoza, 80 Wis. 2d 122, 152, 258 N.W.2d 260 (1977). A court does not "look to the totality of the evidence," as that "would require the court to weigh the evidence——accepting one version of facts, rejecting another——and thus invade the province of the jury." Mendoza, 80 Wis. 2d at 153; Ross v. State, 61 Wis. 2d 160, 172-73, 211 N.W.2d 827 (1973) ("This test does not call for a weighing of the evidence by the trial judge.").[13] Rather, "the question of reasonableness of a person's actions and beliefs, when a claim of self-defense is asserted, is a question peculiarly within the province of the jury." Maichle v.

---

[12] State v. Schuman, 226 Wis. 2d 398, 404, 595 N.W.2d 86 (Ct. App. 1999) (citing United States v. Sotelo-Murillo, 887 F.2d 176, 178 (9th Cir. 1989); United States v. Kessee, 992 F.2d 1001, 1003 (9th Cir. 1993)).

[13] State v. Peters, 2002 WI App 243, ¶27 n.4, 258 Wis. 2d 148, 653 N.W.2d 300 ("The 'some' evidence standard is a relatively low threshold, in part because of the distinct functions of judge and jury."); Walter Dickey, David Schultz & James Fullin, Jr., The Importance of Clarity in the Law of Homicide: The Wisconsin Revision, 1989 Wis. L. Rev. 1323, 1347 (The "some" evidence standard is a relatively low threshold, in part, because of the distinct functions of judge and jury—— evaluating the weight and credibility of the evidence is traditionally a task reserved to the jury.).

Jonovic, 69 Wis. 2d 622, 630, 230 N.W.2d 789 (1975) (citing Higgins v. Minagham, 76 Wis. 298, 45 N.W. 127 (1890)).[14]

¶19 In the instant case, if "some evidence" were offered at trial that the defendant reasonably believed that another person was unlawfully interfering with his person and that he used or threatened to use such force as he reasonably believed necessary to prevent or terminate the interference, "then it is for the jury, not for the [circuit] court or this court, to determine whether to believe [the accused's] version of events." Mendoza, 80 Wis. 2d at 153.

¶20 With the low "some evidence" quantum of evidence standard in mind, we turn to the record to determine whether there was sufficient evidence to support an instruction to the jury on self-defense.

¶21 The State argues that the defendant's testimony was incredible on its face and that, as a matter of law, the evidence was insufficient to warrant a self-defense instruction, and that any claim of self-defense was so discredited that no reasonable jury would believe the defendant.[15]

---

[14] See also State v. Jones, 147 Wis. 2d 806, 816, 434 N.W.2d 380 (1989) (citing State v. Mendoza, 80 Wis. 2d 123, 156, 258 N.W.2d 260 (1977)).

[15] "If perfect self-defense is placed in issue by the trial evidence, the state must prove beyond a reasonable doubt that one of the defendant's beliefs was not reasonable." Head, 255 Wis. 2d 194, ¶70.

11

¶22 We focus on the encounter from the defendant's perspective. We view the record favorably to the defendant, as the case law requires, to assess whether a reasonable jury could find that a person in the position of the defendant under the circumstances existing at the time of the incident could reasonably believe that he was exercising the privilege of self-defense.

¶23 We do not present the defendant's one-sided picture of the events as representing the entire story. The defendant's testimony was not always consistent and it was contradicted. We conclude, however, that the defendant's version of the events, sometimes supported on specific points by the two wardens, provided an adequate factual basis supporting the defendant's explanation that he was exercising his right to defend himself. The jury was not obliged to believe the defendant, but they could have believed him. Following is the evidence from the defendant's perspective.

II

¶24 The defendant was a 64-year-old farmer at the time of the incident in question. He owned a parcel of land in Lafayette County on which he pastured cattle, hunted, and gathered morel mushrooms. The land consists of grassy, open areas, including pasture areas; rolling hills; and some wooded areas.

¶25 The defendant's parcel of land is surrounded by land owned by the defendant's uncle. The defendant had the benefit

of an easement (right-of-way) for ingress and egress over the uncle's land to Highway 81.

¶26 A fence separates the defendant's land from his uncle's land on all sides, interrupted only by a metal, swinging "cattle gate." The gate marks the point where the easement, recognizable as a two-track, dirt-road-like path, connects the defendant's land to Highway 81. The fence keeps trespassers out and cattle in.

¶27 The uncle testified that he and the defendant generally stayed off of each other's land. Occasionally, the defendant and his uncle would enter each other's land to check the fence line.

¶28 The defendant testified that, over the years, he has had problems with trespassers. Many would hunt illegally, and some would vandalize his property. He posted "no trespassing" signs and asked the Lafayette County Sheriff for help with trespassers on numerous occasions. During deer season——when he often had the worst trespassing problems——the defendant would check his land for trespassers. He would be armed when he went on the land, because he knew that anyone hunting illegally would likely be armed.

¶29 On the afternoon in question, Sunday, November 25, 2012, the last day of gun deer season, the defendant patrolled his property for trespassers and walked his fence line to make sure that it had no holes. Now that gun deer season was over, he planned to pasture a longhorn cow. Because the defendant was not going to hunt and would not have to haul a deer carcass

13

home, he drove his wife's Chevrolet sedan. He parked the sedan in a field near the gate to his land.

¶30 The defendant carried his rifle in a safe position[16] with the safety on and kept a handgun in his coat pocket as he always did. Although the handgun held six rounds, he kept only five rounds in it because the gun did not have a safety; he did not like to leave a round in the cylinder that could be accidentally discharged.

¶31 The defendant wore a camouflage coat and hat. He did not wear any blaze orange (as most hunters would) because he was not hunting and was on his own private property.[17]

¶32 Wisconsin Department of Natural Resources (DNR) Wardens Frost and Webster were out on patrol on the afternoon in question. They were looking for hunters who were trying to nab an eleventh-hour deer after the gun deer season ended at 4:45 p.m. (20 minutes after the 4:25 p.m. sunset).

¶33 They drove on the surface roads, using binoculars to find hunters. They saw no one and heard no signs of hunting. At around 4:58 p.m., the two wardens noticed a car (the defendant's wife's Chevrolet sedan) parked in a field along a

---

[16] The defendant described this safe position as holding the rifle in front of his body, with one hand on the foregrip of the rifle, and the other somewhere around the stock. Neither of his hands was on the trigger. The muzzle was pointed up.

[17] The defendant did have a blaze orange vest stuffed into a coat pocket, which, he testified, remained in his pocket from weeks before. This vest was the "sliver" of blaze orange that the wardens testified they saw on the defendant.

14

fence line about a quarter-mile from the highway. The two wardens drove their DNR pickup truck across the field and up to the sedan. As one of them peered into the sedan, he observed what he concluded were signs of hunting: an empty gun case, a bottle of "Buck Lure" (a scent-killer spray), and a camouflaged tree seat. The other warden checked the vehicle's registration and found that the sedan was registered to Robert Stietz, the defendant, and his wife, Susan Stietz.

¶34 Apparently concluding that whoever owned this sedan was hunting after the gun deer season ended, the two wardens decided to look around. Before leaving their DNR pickup truck, both wardens donned their blaze-orange, department-issued jackets. Like their uniforms, their blaze-orange jackets bore DNR insignia. The DNR patch insignia on the shoulder of each arm of the jacket were not, however, as conspicuous as the DNR insignia on their uniforms. Each warden also had a DNR badge on his jacket and a hat bearing a DNR insignia patch. Although neither warden had a rifle, as most deer hunters do, each carried a handgun and a long flashlight.

¶35 The two wardens headed north and came upon a partially open cattle gate. They walked through the open cattle gate, entered the defendant's fenced-in parcel, and followed a path in the grass worn down by cattle's hooves.

¶36 The defendant testified that as he was walking on his uncle's land checking the fence line, he saw blaze orange in the woods. He headed toward the cattle gate to enter his land and identify these blaze-orange-clad figures. He testified: "I

15

encountered two people in orange that was on my property . . . and I didn't know who they were." He stated: "I wondered who was trespassing. This is my thought, I was wondering who was trespassing in my land that I did not know."

¶37 The two wardens testified that they heard the defendant before they saw him. As they were walking on the cattle path, they heard a stick snap behind them, turned around, and saw the defendant walk a few steps, stop and look around, and then continue walking.

¶38 It was "nearly completely dark," according to Warden Webster, when the three men crossed paths. As the two wardens approached the defendant from a distance of about 20 or 30 yards, flashlights were shined at the defendant.

¶39 The defendant explained that he did not see the DNR insignia or badges on the men's attire as the men approached. The defendant testified that he did not notice the DNR insignia on their jacket sleeves because he was "wondering who was trespassing in [sic] my land" and "trying to study their face[s]." The blaze-orange jackets signified hunters to the defendant and the darkness reduced the chance that the defendant would identify the two men as wardens by their uniforms.

¶40 According to the defendant, neither man clearly identified himself as a game warden as they approached him, leading the defendant to suspect that the two were trespassers hunting illegally on his land. The men did nothing to correct the defendant's misunderstanding of their identity. Although he testified that he heard one of the men mumble something about

16

"warden," and the other mumbled something about "Green County," the defendant said he thought the men were asking if he was or had seen a warden.

¶41 The defendant's belief that the two men were trespassing hunters was bolstered by the defendant's interpretation of their words and conduct. The two men inquired into how many deer the defendant had seen that day and whether he was hunting. The defendant told the men he had seen seven doe but that he was not hunting.

¶42 The defendant testified that when he told the two men that he was looking for trespassers and was not hunting, one of the men "threw up his arms" and appeared "riled" by this statement. The defendant testified that this response was prompted because "I believe they took it for that they was [sic] trespassing and that will be my feeling."

¶43 The defendant also testified that the two men appeared to be circling him early on in the encounter as he attempted to back away from them by ducking back through the gate and heading towards his car to drive home.

¶44 One of them, Warden Webster, asked the defendant whether his rifle was loaded. The defendant said yes. The other man, Warden Frost, twice asked for the rifle. The defendant said no both times. The two men began to make the defendant fear for his life. According to the defendant, "That is when they proceeded——I felt like I was being attacked right at that time."

¶45 Warden Frost initiated physical contact with the defendant, grabbing the defendant by the front of his garment while reaching for the rifle.

¶46 The other man, Warden Webster, entered the fray. The men grappled over the rifle, pointing the barrel every which way. The rifle was wrested from the defendant. Warden Frost ended up on his back on the ground. He held the rifle momentarily, considering whether to use it. He cast it aside when he could not figure out how to turn the safety off. This tussle ended when the defendant no longer had the rifle.

¶47 The defendant then saw Warden Webster fumbling to pull a handgun from a holster on his hip. At trial, all three men agreed that Warden Webster was the first to pull his handgun and that he pointed it at the defendant. Warden Frost then drew his handgun and pointed it at the defendant. The defendant reached for his own handgun because, as he testified, he thought "my God, he's going to shoot." The three men agreed that Warden Frost and the defendant drew their handguns about "simultaneously." The defendant stated to the two men that he had a right to protect himself. There they were, three men with handguns trained on each other.

¶48 The defendant testified he did not know the two men were wardens at this point; he just knew he was scared and feared for his life:

I felt like I was being attacked right at that time.

. . . .

18

> [A]ll of a sudden I seen the pistol coming up. And I figured, my God, he's going to shoot.
>
> . . . .
>
> I was scared, darn scared.
>
> . . . .
>
> At that very instant I had the pistol in my right pocket and I drew my pistol at the very—simultaneously. I said, I have the right to protect myself which I am doing at this time.
>
> . . . .
>
> [S]omeone else pulled their pistol out and I was fearful for my life so I drew mine so I would not get shot.

¶49 The two wardens and the defendant testified that the defendant told the men that he was exercising his right to defend himself: "I have the right to protect myself which I am doing at this time." And the defendant told the two men, repeatedly, that he would lower his handgun when they lowered theirs because one of them, Warden Webster, drew first.

¶50 While pointing his gun at the defendant with one hand, Warden Webster used his other hand to activate his collar microphone and call Lafayette County dispatch for assistance. The defendant testified that even when he heard this call being made, he still "really didn't know positive for sure [that they were officers] . . . because I never seen no credentials."

¶51 The defendant testified he was relieved when the call for help was made. He began to realize, for the first time, that the two men were wardens and that assistance in the form of sheriff's deputies would soon arrive. The defendant then backed

19

a few feet away from the two men, moving nearer to the gate.  He assumed this position and waited for the backup to arrive.

¶52  The defendant continued to point his handgun at the men after they called for backup.  He stated he did so only because the two refused to lower their handguns first.

¶53  The defendant refused to lower his handgun because he felt unsafe, even after realizing that the two men were wardens. It was dark out, and the three of them were in an unpopulated rural area.  The two men, who had earlier attacked him without provocation, held their handguns pointed at the defendant's face.  The defendant, by contrast, held his gun in one hand near his side and was leaning against a fence post.

¶54  The defendant saw a squad car's emergency lights flashing.  After the first deputy sheriffs arrived, the two wardens backed away from the defendant with their handguns still drawn.  They retreated to the squad car along with the deputy sheriff.

¶55  A lengthy standoff ensued.  As more deputies arrived, they spoke to the defendant to persuade him to disarm.  The defendant explained that after the deputies assured him that he would not be "gang tackled," he lowered his gun to his side, emptied the cartridges onto the ground, and dropped the gun to the ground.

¶56  The defendant peaceably surrendered.  He walked to the squad car where he was arrested.

¶57  No one was hurt.  No weapons were ever fired by anyone.  All three men acknowledged that the defendant never

threatened to shoot the two men; he never raised his voice during the encounter; he never used any profanity; he did not try to prevent the two men from calling for help and backup; and he did not try to prevent or discourage the retreat of the two men to the squad car.

¶58 Insofar as the instruction on self-defense hinged on the defendant's credibility, credibility is a question to be resolved by the jury, not the circuit court, the court of appeals, or this court. State v. Coleman, 206 Wis. 2d 198, 213-14, 556 N.W.2d 701 (1996). A court does not weigh the testimony. The court focuses, instead, on whether there is "some evidence" supporting the defendant's self-defense theory.

¶59 The evidence that the defendant was in fear for his life and believed he was exercising the threat of reasonable force went beyond the minimal quantum of "some evidence" necessary to establish the defendant's right to a jury instruction on self-defense.

¶60 We conclude that an adequate basis exists in the record to support a self-defense instruction and to allow the defense of self-defense to be argued to and considered by the jury. A reasonable jury could find that a person in the position of the defendant under the circumstances existing at the time of the incident could reasonably believe that the two men were unlawfully interfering with his person and that he was threatening reasonable force in the exercise of his privilege of self-defense. Therefore, we conclude that the circuit court erred in refusing to instruct the jury on self-defense.

21

III

¶61 Because we conclude that the circuit court erroneously refused to instruct the jury on self-defense, we next consider whether the error affected the defendant's "substantial rights."[18] Wis. Stat. § 805.18(2).[19] This statute codifies Wisconsin's harmless error rule.[20]

¶62 The harmless error inquiry raises a question of law that this court decides. State v. Magett, 2014 WI 67, ¶29, 355 Wis. 2d 617, 850 N.W.2d 42.

¶63 A defendant's substantial rights remain unaffected (that is, the error is harmless) if it is clear beyond a reasonable doubt that a rational jury would have come to the

---

[18] Peters, 258 Wis. 2d 148, ¶29.

[19] The harmless error rule set forth for civil actions applies to criminal proceedings via Wis. Stat. § 972.11. State v. Harvey, 2002 WI 93, ¶39, 254 Wis. 2d 442, 647 N.W.2d 189.

Wisconsin Stat. § 805.18(2) provides:

 No judgment shall be reversed or set aside or new trial granted in any action or proceeding on the ground of selection or misdirection of the jury, or the improper admission of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court to which the application is made, after an examination of the entire action or proceeding, it shall appear that the error complained of has affected the substantial rights of the party seeking to reverse or set aside the judgment, or to secure a new trial. (Emphasis added.)

[20] State v. Sherman, 2008 WI App 57, ¶8, 310 Wis. 2d 248, 750 N.W.2d 500 (citing Harvey, 254 Wis. 2d 442, ¶39 (footnote omitted)).

same conclusion absent the error or if it is clear beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.[21]

¶64 The jury's acquittal of the defendant on four of the six charges (including the most serious felony count) in part depended on the defendant's testimony that at times conflicted with that of the wardens. The acquittals suggest that the jury believed all or some of the defendant's testimony and, if given the self-defense instruction, might have acquitted the defendant on one or both of the two charges upon which they convicted the defendant.

¶65 We therefore conclude that the circuit court's error in refusing to give the jury a self-defense instruction was not harmless error. It is clear beyond a reasonable doubt that a rational jury would not have come to the same conclusion absent the error; it is clear beyond a reasonable doubt that the error complained of contributed to the guilty verdict.

¶66 Because self-defense could have absolved the defendant of one or both of his convictions, the circuit court's refusal to give the self-defense instruction affected the defendant's substantial rights. The error was not harmless.

* * * *

---

[21] <u>State v. Magett</u>, 2014 WI 67, ¶29, 355 Wis. 2d 617, 850 N.W.2d 42; <u>Nader v. United States</u>, 527 U.S. 1, 15, 18 (1999); <u>Chapman v. California</u>, 386 U.S. 18, 24 (1967); <u>Harvey</u>, 254 Wis. 2d 442, ¶46 (citing <u>Nader</u>, 527 U.S. at 18).

¶67 In sum, after viewing the record in the light most favorable to the defendant, as we must, we conclude that there was sufficient evidence supporting a self-defense instruction in the instant case. Accordingly, we conclude that the circuit court erred in refusing to instruct the jury on self-defense.

¶68 A reasonable fact-finder could determine that the defendant reasonably believed that the two men who accosted him with weapons on his land and on land upon which he had an easement were not wardens with the Wisconsin Department of Natural Resources; that the defendant reasonably thought that the two men were trespassers hunting illegally; that because the two men forcibly wrested his rifle from him and then drew their handguns on him, the defendant reasonably believed that the two men were unlawfully interfering with his person; that the two men pointing handguns at the defendant caused him to fear for his life; and that the defendant pointed his handgun at the two men believing he had to defend himself. In sum, the jury could conclude that the defendant threatened to used force as he reasonably believed necessary to prevent or terminate the interference with his person.

¶69 We further conclude that the circuit court's error affected the defendant's substantial rights; it was not harmless error.

¶70 Accordingly, we reverse the decision of the court of appeals and the judgment of the circuit court. We remand the cause to the circuit court for a new trial.

24

*By the Court.*—The decision of the court of appeals is reversed and the cause remanded.

¶71  ANN WALSH BRADLEY, J., did not participate.

¶72 REBECCA GRASSL BRADLEY, J. *(concurring).* I agree with the majority opinion's analysis supporting Stietz's entitlement to the self-defense jury instruction and join the opinion. I write separately because the circuit court also erred when it refused to allow Stietz to present a defense based on evidence that the DNR wardens were trespassers on private property, and I disagree with the majority's assertion that "[w]e need not" address this issue. Majority op., ¶4 n.5. I also write to reaffirm that the Fourth Amendment prohibits the government from seizing a person on private property——including open fields——absent consent, a warrant, probable cause and exigent circumstances, or another lawful basis for interfering with a person's right to be free from governmental intrusion.

I

¶73 The Sixth Amendment guarantees a criminal defendant the right to present a defense. See Chambers v. Mississippi, 410 U.S. 284, 302 (1973).[1] "[A] fundamental element of due process of law," the right to present a defense includes "the right to present the defendant's version of the facts . . . to the jury so it may decide where the truth lies." Washington v. Texas, 388 U.S. 14, 19 (1967); see also State v. Dodson, 219 Wis. 2d 65, ¶¶35-36, 580 N.W.2d 181 (1998). "Whether an evidentiary ruling infringes upon a criminal defendant's right to present a defense is a question of constitutional fact for

---

[1] There are some limits on the right to present a defense that are not relevant here. See State v. St. George, 2002 WI 50, ¶15, 252 Wis. 2d 499, 643 N.W.2d 777.

independent review." State v. Ward, 2011 WI App 151, ¶15, 337 Wis. 2d 655, 807 N.W.2d 23 (quoted source omitted). The majority opinion sets forth the proper standard of review as to whether the circuit court erred when it refused to give the requested jury instructions, and therefore I will not repeat it here. See majority op., ¶¶12-14 & n.10. Stietz wanted to testify he thought the DNR wardens were trespassers, and sought to make that argument to the jury, but the circuit court limited his testimony on trespassing,[2] refused to allow his attorney's argument, and denied his request for the jury to be instructed on the law of trespass. The circuit court erred. These errors, together with the self-defense error, violated Stietz's constitutional right to present a defense.

¶74 A brief examination of the facts puts the trespass issue into context. Stietz had problems with trespassers in the past and lodged numerous trespassing complaints with the local sheriff's department. One trespasser broke windows on a trailer Stietz kept on the land. At the time Stietz encountered the wardens, he was checking for trespassers on his private, fenced land marked by conspicuous "no trespassing" signs; he was also inspecting the integrity of his fence because he intended to

---

[2] The State filed a motion in limine asking the circuit court to prohibit any testimony referring to the wardens as trespassers. The circuit court ruled: "[Stietz] can say that he was patrolling for trespassers, but he can't say that the wardens were trespassing." When Stietz testified "I encountered two trespassers on my property," the circuit court ordered the statement "stricken from the record" and instructed the jury to "dismiss it from your minds entirely and not consider it in your deliberations at all, as though it was never said."

pasture a longhorn cow there the following day. The sun had set and it was fairly dark as 64-year-old Stietz walked his property——alone. He had not invited anyone onto his private property and was not expecting any visitors. This property, located approximately half a mile from the public road, was surrounded by other private property, part of which belonged to Stietz's uncle. There was no formal or permanent walkway or driveway inviting visitors onto the private land.

¶75 DNR Wardens Frost and Weber entered Stietz's private land shortly after hunting hours ended on November 25, 2012, while en route to a citizen complaint in another county. While driving along the public road adjacent to privately-owned property, the wardens saw a small sedan parked on the grassy area of private property, about a quarter mile from the road. The wardens decided to circle the area, which included Stietz's private property, to check for hunters who might be hunting after hours. During this trip, the wardens listened for any audible sound and used binoculars and a scope to scour the land for hunters. They heard nothing and saw no one. Nevertheless, the wardens decided to drive onto the private property to investigate the legally parked car. There was no formal driveway, but a portion of the grassy field suggested a "field lane," which they used to reach the car. Warden Webster ran the registration on the car, which belonged to Robert and Sue Stietz, the adjacent property owners. Warden Frost got out and looked into the car's windows. He saw an empty rifle case, some buck lure, and a tree seat. The wardens decided to proceed

further onto the private property to look for illegal hunters. No attempt was made to contact the owners of the private land, there was no evidence of dead or diseased wild animals on the land, there was no audible noise suggesting illegal hunting or suspicious activity, and there was no evidence that a crime had been or was about to be committed.

¶76 While checking the fence, Stietz saw two strangers clad in orange about 20 to 30 yards away, walking on his property. When the two men approached Stietz, they turned a flashlight toward him and asked him to give them his rifle. Stietz—an armed services veteran, a citizen with no criminal record, and a hunter without violations in the past 50 years—refused to turn his weapon over to two men he did not know who appeared uninvited on his private land. At that point, Warden Webster physically grabbed Stietz, and the two wardens forcibly wrested the shotgun away from him.[3] After the seizure, all three men drew their handguns, resulting in the standoff that formed the basis for the charges in this case.

¶77 Stietz, who testified on his own behalf, wanted to tell the jurors that he believed the two men were trespassers, and the circuit court erred in barring this part of Stietz's testimony. "All relevant evidence is admissible, except as otherwise provided by the constitutions of the United States and

---

[3] Stietz says Warden Webster grabbed his shirt before the wardens grabbed his rifle. Both wardens deny grabbing Stietz. For the purpose of this court's review, however, we view the facts in the light most favorable to Stietz. See State v. Head, 2002 WI 99, ¶9, 255 Wis. 2d 194, 648 N.W.2d 413.

4

the state of Wisconsin, by statute, by these rules, or by other rules adopted by the supreme court." Wis. Stat. § 904.02. A defendant has a fundamental right to testify and give, in his own words, his version of what happened. See State v. Nelson, 2014 WI 70, ¶19, 355 Wis. 2d 722, 849 N.W.2d 317. Stietz's testimony giving his version of events was relevant and should have been admitted. Excluding the trespass testimony prevented Stietz from fully presenting his defense.

¶78 Stietz's attorney also sought to argue the wardens were in fact trespassers, and requested a trespass jury instruction, but the circuit court refused both requests. It concluded the wardens were not trespassing. The law, however, does not support the circuit court's decisions and instead confirms Stietz's argument that the wardens were trespassing.

¶79 Wisconsin Stat. § 943.13 prohibits any person from entering the land of another without express or implied consent of the owner or occupant. The wardens did not have consent from Stietz or his uncle. Wisconsin Stat. § 29.924(5) allows DNR wardens to enter private lands for the purpose of "retriev[ing] or diagnos[ing] dead or diseased wild animals and tak[ing] actions reasonably necessary to prevent the spread of contagious disease in the wild animals," and wardens may enter the property only "after making reasonable efforts to notify the owner or occupant." The wardens made no effort at all to notify Stietz or his uncle before entering the private land, and there were no dead or diseased wild animals in need of retrieval or diagnosis.

5

¶80 Wisconsin Stat. § 23.58(1), which authorizes DNR wardens to conduct a <u>Terry</u>[4] stop, provides that "an enforcing officer," "having identified himself or herself as an enforcing officer," "may stop a person in a <u>public place</u> for a reasonable period of time when the officer reasonably suspects that such person is committing, is about to commit or has committed a violation" of any applicable laws or rules. (Emphasis added.) The wardens here were not in a public place and, even if <u>Terry</u> permitted investigatory stops on private property, the wardens did not have reasonable suspicion that Stietz was breaking the law when they drove onto private property to investigate. Reasonable suspicion exists when a law enforcement officer possesses "specific and articulable facts that warrant a reasonable belief that criminal activity is afoot." <u>State v. Young</u>, 2006 WI 98, ¶21, 294 Wis. 2d 1, 717 N.W.2d 729. The DNR equivalent would require a reasonable belief that a hunting violation is afoot. A car legally parked on private property does not, alone, create reasonable suspicion of a hunting violation. A mere "hunch" that the car means someone is hunting illegally is also insufficient. <u>See</u> <u>id.</u>

¶81 Wisconsin Stat. § 23.59 authorizes a search for weapons during a § 23.58 <u>Terry</u> stop if there is a reasonable suspicion of danger to the warden or another person. But, once again, these statutes apply only to a stop in a <u>public place</u>, not a stop on private property. Wisconsin's codification of the

---

[4] <u>See</u> <u>Terry v. Ohio</u>, 392 U.S. 1 (1968).

6

_Terry_ stop in Wis. Stat. § 968.24 also specifies that a stop under this statute must occur in a public place. See _State v. Stout_, 2002 WI App 41, ¶15, 250 Wis. 2d 768, 641 N.W.2d 474 (holding that police may confront citizens only in public places; private places require a warrant or "probable cause and exigent circumstances or consent"). Stietz's 25-acre parcel of fenced and posted land was not a public place.

¶82 At oral argument in this case, the State could not identify any law authorizing the wardens to be on Stietz's land. There is none. The State asserted only that the "open fields" doctrine justified the wardens' intrusion on private property, reasoning that the doctrine made Stietz's secluded, remote land a "public place" on which the wardens were privileged to traverse. The State is wrong. The open fields doctrine does not transform private fields into public places that anyone is free to enter uninvited or without reason. Nor does it convert the act of trespassing into a lawful intrusion. See _Oliver v. United States_, 466 U.S. 170, 183 (1984) ("The law of trespass . . . forbids intrusions upon land that the Fourth Amendment would not proscribe."). Rather, the open fields doctrine only prevents suppression of evidence gathered by law enforcement officers who enter an open field without a warrant. The open fields doctrine does not sanction the seizure of a person, nor does it create the requisite constitutional basis for seizing a person acting lawfully simply because the person is standing in an open field. Significantly, the open fields cases arose after law enforcement officers observed evidence of

7

suspected illegal activity conducted upon the land either directly or indirectly, through an informant or tipster. See id. at 173-77 (police investigating a tip of marijuana farm saw illegal plants in field; suppression not required); Hester v. United States, 265 U.S. 57, 57 (1924) (police investigating a tip of illegal activity chased suspects who ran when police arrived; suppression of evidence tossed in open field not required); State v. Martwick, 2000 WI 5, ¶¶9, 10, 12, 32, 37, 43, 231 Wis. 2d 801, 604 N.W.2d 552 (evidence admissible where informant reports marijuana plants, police see plants in open area beyond curtilage that is not fenced in or posted "no trespassing," police take a leaf to test, and police later obtain warrant).

¶83 The DNR wardens did not receive a tip or make a direct observation that Stietz was engaged in illegal activity on his property. When the wardens observed the property before entering, they saw no evidence of illegal activity. Warden Frost testified that they drove completely around the area surrounding Stietz's private property and used binoculars to look for hunters, but they "didn't see any evidence that anybody was out in the field at the time." Importantly, Stietz is not seeking to suppress evidence taken from his property to be used against him in a criminal prosecution. The open fields exception to the Fourth Amendment's warrant requirement was not intended to eliminate property owners' rights by sanctioning

8

entry onto open land at any time for any reason, or no reason at all.[5]

¶84 The State's bald assertion in its brief that "wardens do not need reasonable suspicion to believe that a crime has been committed before they enter private land" is erroneous. The State has not cited and I cannot locate any authority permitting DNR wardens to traverse privately owned lands without any legal justification. As already noted, the reasonable suspicion standard applies to public places, not an individual's remote, secluded, fenced, and posted private land. Even if we

---

[5] Multiple states reject the open fields doctrine with respect to fenced, posted, or otherwise closed off private lands, recognizing an expectation of privacy on the part of landowners, particularly for land with "no trespassing" signs. See State v. Dixson, 766 P.2d 1015, 1024 (Or. 1988) ("[I]f land is fenced, posted or otherwise closed off, one does not enter it without permission or, in the officers' situation, permission or a warrant."); People v. Scott, 593 N.E.2d 1328, 1335-37 (N.Y. 1992) ("A constitutional rule which permits State agents to invade private lands for no reason at all——without permission and in outright disregard of the owner's efforts to maintain privacy by fencing or posting signs——is one that we cannot accept as adequately preserving fundamental rights of New York citizens. . . . [T]he unbridled license given to agents of the State to roam at will without permission on private property in search of incriminating evidence is repugnant to the most basic notions of fairness in our criminal law."); State v. Johnson, 879 P.2d 984, 993 (Wash. Ct. App. 1994) ("[P]olice should not be empowered to invade land closed to the public . . . .'" (quoted source omitted)); State v. Bullock, 901 P.2d 61, 75-76 (Mont. 1995) ("[A] person may have an expectation of privacy in an area of land that is beyond the curtilage . . . , and . . . where that expectation is evidenced by fencing, 'No Trespassing,' or similar signs, or 'by some other means [which] indicate[s] unmistakably that entry is not permitted,'. . . entry by law enforcement officers requires permission or a warrant." (citation and quoted source omitted; second and third brackets in original)).

9

applied the reasonable suspicion standard to private land, the only information the DNR wardens possessed before intruding onto private property was a legally parked car. This falls far short of satisfying the reasonable suspicion standard.

¶85 The State also asserts that Stietz lacks standing to invoke trespass as a defense because the physical confrontation with the wardens occurred on his easement just outside his private property. Stietz has not sued the wardens for trespass; rather, he argues, in defense of his actions, that he did not know these two men were wardens but believed them to be trespassers on private property where Stietz was lawfully present (unlike the wardens). Whether the wardens confronted and seized Stietz on the easement instead of Stietz's private property does not change the fact that the wardens seized Stietz on private property rather than in a public place, absent consent, a warrant, probable cause, exigent circumstances, or any other lawful basis to intrude.

¶86 The circuit court's ruling on self-defense and trespass denied Stietz the right to tell the jury his version of events and therefore substantially impaired his right to present a defense. It appears the circuit court's reason for refusing to instruct the jury on trespass arose from the court's mistaken belief that the wardens had authority to be on the private land and therefore could not be trespassers. The circuit court erred. Based on this record, there was no legal basis for the wardens to be on Stietz's (or his uncle's) private property. By entering it merely on a hunch, the wardens exceeded their

10

authority under the law and should be treated as trespassers: "[W]here an authority given by law is exceeded, the officer loses the benefit of his justification, and the law holds him a trespasser ab initio although to a certain extent he acted under the authority given." Wallner v. Fidelity & Deposit Co. of Maryland, 253 Wis. 66, 70, 33 N.W.2d 215 (1948). Stietz had the right to present evidence and to argue that these two men——who exceeded their lawful authority by entering private land uninvited, demanding he relinquish his rifle, grabbing him, and forcibly wresting the rifle out of his hands——were trespassers.

¶87 The standard for giving a jury instruction requires that the circuit court instruct the jury on an issue raised by the evidence. See State v. Kramar, 149 Wis. 2d 767, 792, 440 N.W.2d 317 (1989). The evidence presented at trial supports the conclusion that the wardens were trespassers. By prohibiting Stietz's counsel from arguing trespass and refusing to instruct the jury on trespass law, the circuit court prevented Stietz from presenting a full defense to the jury on the two counts of which the jury convicted Stietz.

¶88 Count 3 required the State to prove that the wardens were acting with lawful authority. See Wis. Stat. § 946.41(1). Part of Stietz's defense to Count 3 was that because the wardens were trespassers, they acted without lawful authority. Count 6 required the State to prove that the wardens were law enforcement officers acting in an official capacity and whom Stietz had reason to believe were law enforcement officers. See Wis. Stat. § 941.20(1m)(b). Setting aside Stietz's claim that

11

the legislature did not include "conservation wardens" in those listed as "law enforcement officers" for the purposes of this section (which if correct could provide an independent basis for reversal), part of Stietz's defense to Count 6 was that he believed the wardens were trespassers, not law enforcement officers. Whether the wardens were in fact trespassing is relevant to the reasonableness of Stietz's belief that these two men were trespassers rather than wardens.

¶89 It is the jury's role to resolve factual disputes and credibility issues. See State v. Poellinger, 153 Wis. 2d 493, 506-07, 451 N.W.2d 752 (1990). This case was full of factual disputes, which the jury evidently resolved in Stietz's favor by acquitting him on four of the six counts. Indeed, the majority correctly concludes that a reasonable jury could find that "the defendant reasonably thought that the two men were trespassers hunting illegally." See majority op. ¶68. The circuit court should have allowed the jury to consider trespass. The trespass evidence and argument are also pertinent to the self-defense theory Stietz attempted to present. By limiting Stietz's testimony on trespass, precluding Stietz's attorney from arguing that the wardens were trespassing, and refusing to instruct the jury on trespass law, the circuit court erroneously prevented Stietz's attorney from fully presenting his defense.

¶90 The majority opinion properly analyzes the self-defense error. By not addressing trespass, however, it paves the way for the circuit court on remand to again violate Stietz's right to present his defense, which includes both self-

12

defense and trespass. I would direct the circuit court to honor Stietz's fundamental constitutional right by allowing his testimony and argument that the wardens were trespassers who therefore acted without lawful authority and requiring the circuit court to instruct the jury on trespass.[6]

II

¶91 The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers and effects . . . against unreasonable searches and seizures," U.S. Const. amend. IV.

> No right is held more sacred, or is more carefully guarded, by the common law than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.

Terry, 392 U.S. at 9 (quoting Union Pac. R. Co. v. Botsford, 141 U.S. 250, 251 (1891). "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." Terry, 392 U.S. at 16. There is no authority under the law permitting DNR wardens to wander private property in search of unknown violations of the law. Absent legal authority, a DNR warden may not enter private property to confront and seize an unsuspecting, law-abiding citizen who has fenced in his property and posted "no trespassing" signs.

---

[6] I do not decide whether the language in Stietz's proposed trespass instruction was appropriate; rather, I hold the evidence supported instructing the jury on trespass.

¶92 The open fields doctrine "affords no protection to evidence either on or in the ground" outside of houses and curtilage. Conrad v. State, 63 Wis. 2d 616, 624-25, 218 N.W.2d 252 (1974) (emphasis added). Even though "the government's intrusion upon the open fields is not one of those 'unreasonable searches' proscribed by the text of the Fourth Amendment," see Oliver, 466 U.S. at 177 (emphasis added), the Fourth Amendment certainly protects a person from unreasonable seizures on an open field. The open fields exception to Fourth Amendment protection has never been applied solely to a seizure of a person lawfully present on private property, without contraband. To the contrary, "[w]here a person is, there also is the protection of the Fourth Amendment." Conrad, 63 Wis. 2d at 628. "[T]he Fourth Amendment protects people, not places." United States v. Jones, 565 U.S. 400, 406 (2012) (quoting Katz v. United States, 389 U.S. 347, 351 (1967)). Fifty years ago, the Supreme Court recognized that "[w]herever a man may be, he is entitled to know that he will remain free from unreasonable searches and seizures," Katz, 389 U.S. at 359, acknowledging that Fourth Amendment protections extend beyond property to "safeguard the privacy and security of individuals against arbitrary invasions by governmental officials," Berger v. New York, 388 U.S. 41, 53 (1967) (quoting Camara v. Mun. Ct., 387 U.S. 523, 528 (1967)).

¶93 "The touchstone of the Fourth Amendment is reasonableness." Florida v. Jimeno, 500 U.S. 248, 250 (1991) (citation omitted). "To determine the constitutionality of a

14

seizure '[w]e must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" Tennessee v. Garner, 471 U.S. 1, 8 (1985) (quoting United States v. Place, 462 U.S. 696, 703 (1983) (brackets in original)). The wardens in this case overlooked Stietz's right to be secure in his person under the Fourth Amendment by forcefully disarming him and seizing him and his lawfully possessed rifle with no lawful basis for doing so. The governmental interest in policing hunting violations cannot justify such an intrusion against an individual. These actions, which led to the standoff and the charges against Stietz, are swept under the rug and forgotten. But, had the wardens not trespassed and had they not forcibly wrested away Stietz's rifle, the standoff——leading to six charges——would not have occurred at all.

¶94 The people of Wisconsin entrust DNR wardens to protect the state's many natural resources, including public forests and land. In order to enable wardens to fulfill their duties, the people of Wisconsin confer powers on them. These powers are not boundless; they are circumscribed both constitutionally and statutorily and do not include free reign to trespass on private lands at will. The wardens in this case unlawfully entered private land, demanded a legally possessed rifle without explanation, and seized Stietz and his rifle when he did not comply. Whether in an open field or on a public street, the people retain their Fourth Amendment right to be free from

15

"arbitrary and oppressive interference by enforcement officials with [their] privacy and personal security." United States v. Martinez-Fuerte, 428 U.S. 543, 554 (1976).

III

¶95 Stietz has a fundamental constitutional right to present a defense grounded in the law governing self-defense and trespass. The circuit court erroneously prevented Stietz from presenting his full defense to the jury, and he is entitled to a new trial. The actions precipitating the standoff in this case implicate the right of the people to be free——particularly on their own private property——of unreasonable searches and seizures under the Fourth Amendment. The Constitution prevents DNR wardens from entering fenced and posted private property, and from seizing law-abiding people, unless there is a legal basis for doing so. Here, there was none, which makes the circuit court's decisions on self-defense and trespass erroneous.

¶96 For these reasons, I respectfully concur.

¶97 I am authorized to state that Justice DANIEL KELLY joins this concurrence, and that Chief Justice PATIENCE DRAKE ROGGENSACK joins this concurrence, except as to Part II.

16

¶98 ANNETTE KINGSLAND ZIEGLER, J. *(dissenting).* "It's amazing in the circumstances we aren't sitting here over an inquest rather [than] these charges, because in most jurisdictions that I know of with Mr. Stietz pulling a gun on [an] officer, he would have been shot. He is very, very fortunate that [the officer] didn't shoot him." So remarked the circuit court below, in a case that arose after the defendant, Robert Joseph Stietz ("Stietz"): (1) refused to surrender his rifle to two Department of Natural Resources ("DNR") wardens lawfully investigating potential hunting violations; (2) drew a handgun on the wardens after being disarmed of the rifle against his will; and (3) failed to surrender the handgun for over half an hour despite repeated requests for compliance.

¶99 Arguments have been made that Stietz is not to blame for the escalation of his interaction with the wardens into an armed standoff. But a jury considered those arguments, and rendered a thoughtful verdict: it concluded that Stietz should not be convicted for offenses pertaining to the initial struggle over the rifle, but that Stietz's subsequent decision to hold two wardens at gunpoint——despite Stietz's own admission that he knew the wardens were law enforcement officers by that time——was a bridge too far. With regard to Stietz's actions toward one of the two wardens, the jury found Stietz guilty of resisting an officer, use of a dangerous weapon, in violation of Wis. Stat. § 946.41(1), with the penalty enhanced by Wis. Stat. § 939.63(1)(a), and guilty of intentionally pointing a firearm at a law enforcement officer, in violation of Wis. Stat.

1

§ 941.20(1m)(b). With regard to Stietz's actions toward the other warden, the jury found Stietz not guilty of resisting an officer, use of a dangerous weapon, and not guilty of intentionally pointing a firearm at a law enforcement officer. The jury also found Stietz not guilty of first degree recklessly endangering safety, in violation of Wis. Stat. § 941.30(1), and not guilty of negligent handling of a weapon, in violation of § 941.20(1)(a).

¶100 What is the likely reason for the jury to conclude that Stietz was guilty of some offenses and not guilty of the others? The jury, considering all of the factors that this court relies upon, concluded that Stietz was not endowed with the authority to continue to point a firearm at law enforcement under these circumstances. This conclusion is not only supportable, it is wise. Imagine the unfortunate consequences that might ensue if anytime someone does not believe that law enforcement has the authority to be somewhere or the authority to act, citizens could take the law into their own hands and escalate a situation by pointing a firearm at the officers. Right or wrong in belief, it is not difficult to understand the unfortunate outcomes that would take place.

¶101 Stietz now appeals, arguing principally that the circuit court erred in declining to instruct the jury that Stietz might have been acting in self-defense and that the

wardens might have been trespassing.[1] This is not a self-defense case. The circuit court was not incorrect. Moreover, the jury's verdict demonstrates that it found his reaction to law enforcement somewhat excusable with respect to the initial contact. The jury, however, found that the continued exhibition of force was not. In other words, the crimes for which he was convicted do not support a self-defense instruction.

¶102 I dissent because I conclude that the circuit court did not err in declining to instruct the jury on the issues of self-defense and trespass. First, Stietz's claim that he was acting in self-defense was "so thoroughly discredited" by the close of evidence "that no reasonable jury could conclude that the state had not disproved it," State v. Head, 2002 WI 99, ¶115, 255 Wis. 2d 194, 648 N.W.2d 413; consequently, he was not entitled to the corresponding instruction and the circuit court properly exercised its discretion in declining to so instruct the jury.

¶103 Second, even if the circuit court had erred in neglecting to instruct the jury on self-defense, that error was harmless. As will be explained in detail below, in order to

---

[1] Stietz contends that the circuit court additionally erred in barring him from arguing that the wardens were trespassers. The reasoning set forth in my discussion of the circuit court's decision on the trespass jury instruction disposes of this issue, so I will not otherwise address it. Further, given my analysis, I need not address the State's argument that because some of the property at issue in this case was owned by Stietz's neighbor, Stietz lacks standing to assert that the wardens were trespassing. For purposes of this writing, I will refer to property at issue as Stietz's property.

have convicted Stietz of resisting an officer, use of a dangerous weapon, and intentionally pointing a firearm at a law enforcement officer, the jury had to have found as elements of those crimes that Stietz knew or had reason to know that Warden Webster was a law enforcement officer. In other words, the jury plainly would have rejected Stietz's claims that he had no idea the wardens were law enforcement officers and was acting in self-defense.

¶104 Third, Stietz had no independent legal right to forcibly resist the wardens simply because he thought the wardens lacked legal authority to seize or disarm him. Stietz is badly mistaken in suggesting that the law authorizes citizens to attack law enforcement officers whenever those officers may have made a mistake of fact or law. Law enforcement officers have entered houses, much less open fields, by accident; that does not authorize lethal resistance. If Stietz thought that law enforcement was in error, his recourse was the judicial system, not physical assault. To hold otherwise is not only incorrect as a legal matter; it would also disincentivize law enforcement officers from doing their job. Most relevant to this case, for example, the work of DNR wardens is critical to ensuring the protection of Wisconsin wildlife and the safety of Wisconsin hunters.[2]

¶105 Finally, with respect to trespass, the wardens possessed both statutory authority to enter Stietz's property

---

[2] Stietz also briefly makes a Second Amendment claim. As I will discuss, I would reject that claim as undeveloped.

4

and reasonable suspicion that hunting violations were in progress. The circuit court did not err in declining to instruct the jury regarding the law of trespass.

¶106 This case is not about property rights, the right to keep and bear arms, or the right to hunt. In no way should this dissent be read to diminish those very important rights. These rights are cherished by the citizens of Wisconsin in a special way, see, e.g., Wis. Const. art. I, § 26 ("The people have the right to fish, hunt, trap, and take game subject only to reasonable restrictions as prescribed by law."), and this court is of course bound to uphold and protect them. Instead, this case is about an individual, Stietz, who put his own life and the life of two DNR wardens at risk rather than peacefully submit to a lawful request for his weapon.

¶107 This case was fully litigated below, and——not surprisingly given the evidence——the jury found Stietz guilty of resisting an officer, use of a dangerous weapon, and intentionally pointing a firearm at a law enforcement officer. I do not quarrel with the jury's determination to find Stietz not guilty of one of the counts of resisting an officer, use of a dangerous weapon, one of the counts of intentionally pointing a firearm at a law enforcement officer, first degree recklessly endangering safety, and negligent handling of a weapon. However, when this case goes back for another trial, the entire case will not be retried, rather only the crimes for which Stietz was found guilty. The jury already placed its determination on the entire nucleus of fact and concluded that

5

he was not guilty of resisting an officer, use of a dangerous weapon, with regard to one of the wardens, not guilty of intentionally pointing a firearm at a law enforcement officer with regard to the same warden, not guilty of first degree recklessly endangering safety, and not guilty of the negligent handling of a weapon.

¶108 At the same time, the jury concluded that Stietz was guilty of resisting an officer, use of a dangerous weapon, and intentionally pointing a firearm at a law enforcement officer with regard to the second warden. Regrettably, while this court is required to give deference to the jury determination, it instead upsets that jury determination even though the jury's conclusions are supported by sufficient evidence in the record. See, e.g., State v. Poellinger, 153 Wis. 2d 493, 507, 451 N.W.2d 752 (1990) ("[I]n reviewing the sufficiency of the evidence to support a conviction, an appellate court may not substitute its judgment for that of the trier of fact unless the evidence, viewed most favorably to the state and the conviction, is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt."). Because I would affirm the court of appeals (the trial court and the sound conclusions reached by the jury upon the facts and the law), I respectfully dissent.

I

¶109 I begin by setting forth the facts of this case as established by the testimony of Warden Frost, Warden Webster,

6

and Stietz at Stietz's jury trial. As will be shown, this case hinges in large part on the testimony presented to the jury.[3]

¶110 Warden Joseph Frost ("Warden Frost") testified that on November 25, 2012, at about 4:30 p.m., he and Warden Nicholas Webster ("Warden Webster") were on duty in a patrol truck on a highway near Lamont, Wisconsin. Warden Frost "observed a vehicle north of the highway parked along the fence line"; in his view it was "not typical for vehicles to be parked in the field," though "typically during deer season that's where people would park if they're out hunting." Warden Frost consequently thought the vehicle might belong to someone hunting deer, whereas Warden Webster thought the vehicle might have been abandoned. It was the last day of deer season, and hunting hours ended at 4:45 p.m. The wardens "decided [they would] just check around that section of land by driving the roads to see if [they] could see anybody out hunting." The wardens did not see anything of note, however, and eventually made their way to the vehicle they had spotted.

¶111 At about 4:58 p.m., Warden Webster ran the registration of the vehicle while Warden Frost "checked to see if there was any evidence of hunting in the vehicle and to . . . see if it was an abandoned vehicle or not." Warden Frost saw an empty gun case on the front seat, scent killer spray, and a camouflaged seat that could be used on a tree

---

[3] Proof that the court is stretching to reach an outcome is the court's incomplete and misleading presentation of the facts.

stand. Warden Webster learned that the vehicle was registered to Robert and Susan Stietz.

¶112 The wardens "decided that [they] would go in and see if [they] could locate the hunter." The wardens were wearing "blaze orange" jackets and hats. The jackets had identification badges or patches on them, as did the hats. Further, the wardens did not carry long guns; Warden Frost testified that that is "usually a give away as to us not being hunters." The wardens followed the fence line until they came to an open gate and then headed through the gate. Eventually they saw a "box blind up on an elevated box stand" and began heading toward it. Shortly thereafter the wardens came upon Stietz, who was dressed in full camouflage and carrying a "long gun." Stietz "would take a few steps and stop, look around, take a few steps, stop and look around." It was dark and Stietz "didn't seem to acknowledge [the wardens] were there." Warden Frost "turned on [his] flashlight and shined it at [Stietz] and announced, 'conservation warden.'" Warden Webster made the same announcement. The parties continued approaching each other and Warden Frost saw what looked like a handgun in Stietz's pocket. Warden Frost told Warden Webster about the handgun. Warden Webster testified that "red flags were starting to go off, starting to not seem right," because Stietz had "in his face a kind of agitation, aggression" and because Stietz "went from holding his gun off to the side and then turned his gun facing straight on as [Warden Webster] was approaching him."

8

¶113 Warden Webster was the first to make contact, and asked Stietz if he had seen any deer. Stietz responded that he had "seen seven doe." According to Warden Frost, Warden Webster then asked Stietz "if the rifle he was carrying was loaded," and Stietz affirmed that it was. Warden Frost "asked [Stietz] if [Warden Frost] could see the firearm," and Stietz refused.[4]

¶114 Warden Frost "changed the topic" and asked if Stietz had any blaze orange with him. Stietz "indicated towards" his pocket, and Warden Frost "could see just a sliver of a piece of orange clothing in there." Warden Frost testified that "[t]he fact that [Stietz was] carrying orange in his pocket, based on my training and experience, would lead me to believe he was actually out hunting." At some point during the parties' interaction, Stietz explained that he had not been hunting, but was instead looking for trespassers. Warden Frost again asked Stietz if he "could see the firearm." Warden Frost testified that there were two reasons he asked to see the weapon:

> One, [Stietz] is dressed in camouflage, it's after hours, he said his firearm is loaded, which I guess gave me reason to believe he was potentially hunting after hours, hunting without blaze orange. And then when he responded he wouldn't allow us to see the firearm. I guess, at that point there is a concern for, I guess, our safety that I guess something could happen if he continues to have the firearm.

Warden Webster additionally explained that "[w]hen [the wardens] are working and enforcing hunting laws, depending on what's

---

[4] Warden Webster's testimony differs to some extent regarding the order of the questions asked and the identity of the questioner. These variations will not be discussed.

9

being hunted, ammunition type, firearms type, amount of ammunition, are also parts that are regulated in hunting."

¶115 When he made his second request to obtain Stietz's weapon, Warden Frost simultaneously "stepped forward and reached [his] hand towards the firearm." Stietz hit Warden Frost in the stomach with the butt of the rifle. Warden Frost then grabbed the rifle and "drove [his] body forward towards [Stietz]." While Stietz and Warden Frost grappled for control of the weapon, Warden Webster "yelled out that . . . the barrel was pointed at him." Warden Webster grabbed the muzzle of the gun and "pulled it as hard as [he] could in the direction that [Warden] Frost was pulling it," yelling "drop the gun." Warden Frost ultimately "ended up with the firearm in [his] hands, laying on [his] back."

¶116 Disarmed of the rifle, Stietz began drawing his handgun. As he was doing so, Warden Webster yelled "don't do it." Warden Webster drew his handgun on Stietz before Stietz had fully drawn his handgun. Warden Frost also drew his handgun, having thrown the rifle "to the side." Stietz "swung [his handgun] by Warden Frost's direction," but then pointed it towards Warden Webster. "[T]he hammer was cocked with his right thumb by the hammer, his trigger finger would have been inside the trigger guard basically on the trigger." The wardens ordered Stietz to lower his weapon, but Stietz refused. Warden Webster "radioed to the Sheriff's Department" at 5:07 p.m. The wardens repeatedly attempted to get Stietz to drop his weapon, but he would not do so. At various times during the standoff

10

Stietz commented, among other things, that he knew his rights, that he was defending himself and his property, and that he would lower his weapon if the wardens lowered their weapons. At other times Stietz would not respond to the wardens at all.

¶117 At 5:17 p.m., Deputy Brett Broge ("Deputy Broge") arrived in his "squad." The wardens retreated to the squad car. At that time Stietz had his handgun pointed "towards the squad." Warden Frost left the parties, returned to Warden Webster's squad, turned on its emergency lights, removed his blaze orange, and obtained a rifle and shotgun from the vehicle. By the time Warden Frost made contact with the parties again, Stietz had lowered his handgun but would not put it down. Other members of law enforcement arrived but Stietz "still basically wouldn't comply." Finally, about "40 to 50 minutes" "from the time . . . [the wardens] were initially there until it was all over," Stietz put his weapon down and was placed in handcuffs.[5]

¶118 Stietz testified that on the date in question he had not been hunting but was instead "checking for trespassers," a recurring issue for Stietz.[6] That evening Stietz "encountered two people in orange" on his property and he "didn't know who they were." While Stietz saw the individuals' "faces and their orange clothing," he denied seeing their patches or badges.

---

[5] Deputy Broge testified that Stietz lowered his weapon at about 5:20 p.m. and that Stietz put his weapon on the ground at about 6:00 p.m.

[6] According to Stietz, the orange vest in his pocket had been placed there days before.

11

According to Stietz, one of the individuals asked, "are you Bob Stietz?" Stietz replied "yes, I am. The question is, who are you?" Stietz heard a response that was "kind of mumbled, but sounded like one was saying Green, I didn't know if it was County. And the other one said——looked at him and said a Warden, but it was kind of mumbled, not real loud." Next, Stietz was asked if he was hunting and was told that he had to be in orange if he was hunting deer. Stietz informed the wardens that he was not hunting deer but was instead "checking for trespassers." When asked if he had seen any deer, Stietz replied that he had seen seven of them.

¶119 According to Stietz, when Stietz said he was checking for trespassers one of the wardens "got——kind of a little bit riled." Additionally, one of the wardens "threw up his arms like this. You've got to be in orange." According to Stietz, the wardens "c[a]me around [Stietz] in like a circle." At that point Stietz "was wanting to go to [his] car and . . . would have been heading home." "The Wardens proceeded around [Stietz] . . . asking [him] questions." One of the wardens said "give me your gun." Stietz said no and took a step back. At that point he "felt like [he] was being attacked" because one of the wardens grabbed his shirt and told the other warden to "grab the gun." Stietz denied swinging the butt of the rifle into Warden Frost's stomach. The three struggled for Stietz's rifle. Stietz "lost [his] grip" and "all of a sudden [Stietz] [saw] the rifle go, and . . . heard it hit the fence." The two wardens "kind of lost their footing." Stietz saw Warden Webster

12

"reaching for his pistol" and "all of a sudden . . . [saw] the pistol coming up." Stietz thought Warden Webster was going to shoot and drew his pistol at the same time. Stietz said, "I have the right to protect myself which I am doing at this time."

¶120 At this point in time all three individuals had their handguns drawn. Stietz was asked to put his weapon down several times but refused, repeatedly stating that he would put his handgun down if the wardens put their handguns down. Eventually one of the wardens called for backup. At trial Stietz was asked, "[W]hen did you know for the first time that these were wardens?" Stietz responded, "I really didn't know positive for sure, because it was kind of dark out and when we——when actually, I really don't know because I never seen no credentials or <u>when he called for backup, that's when I knew really</u>." (Emphasis added.) Stietz testified that he was "scared, darn scared." Backup arrived. The following exchange occurred at trial:

> Q: You said that you were relieved when the Sheriffs showed up; is that right?

> A: That is correct. Relieved.

> Q: But you weren't relieved enough to put your gun down at that point, were you?

> A: As I stated in my testimony, when the wardens put their guns down, because they draw on me first, I would put mine down.

> . . . .

> Q: Why didn't you put it down right away once Deputy Broge was on site?

13

A: As I stated before, the Wardens would not put theirs down, and I wouldn't put mine down until they put theirs down, because they drew on me first.

Stietz eventually lowered his weapon because "when the Sheriffs got there, that's when I felt halfway there'd be witnesses if anything bad happened, there would be witnesses."

¶121 Relevant to Stietz's testimony, Warden Webster and Warden Frost denied mentioning Green County in their initial interaction with Stietz. Warden Webster denied grabbing Stietz's shirt. Warden Frost stated that he did not see Warden Webster grab Stietz by the shirt and that Warden Webster had not yelled at him to grab Stietz's rifle. Warden Webster and Warden Frost denied getting "riled" when Stietz told them that he was checking for trespassers, and Warden Frost denied throwing his arms up in the air.

II

¶122 On November 28, 2012, a criminal complaint was filed against Stietz in Lafayette County circuit court. On December 11, 2012, an amended complaint was filed charging Stietz with one count of first degree recklessly endangering safety, in violation of Wis. Stat. § 941.30(1), two counts of resisting an officer, use of a dangerous weapon, in violation of Wis. Stat. § 946.41(1), and with the penalty enhanced by Wis. Stat. § 939.63(1)(a), one count of negligent handling of a dangerous weapon, in violation of Wis. Stat. § 941.20(1)(a), and two counts of intentionally pointing a firearm at a law enforcement officer, in violation of § 941.20(1m)(b). On December 18, 2012, an information was filed.

14

¶123 On January 22, 2014, Stietz filed requested jury instructions in anticipation of trial. Stietz requested, among other things, that the jury be instructed regarding: (1) Stietz's putative Second Amendment right to refuse to surrender his rifle to the wardens; (2) the possibility that the wardens were trespassing on Stietz's land; and (3) the possibility that Stietz was acting in self-defense.

¶124 On February 20, 2014, the State filed a motion in limine requesting an order

> prohibiting the defendant from arguing any of the following at trial: that the DNR Wardens were armed trespassers; that the DNR Wardens were not authorized to enter his property; that the defendant had a Second Amendment right to resist the Wardens; any arguments by the defendant of self-defense of either person or property.

After a hearing on February 26, 2014, the court entered the following order with respect to the State's motion:

> 1. The Court will allow evidence (a) that Mr. Stietz was looking for trespassers, (b) that the wardens were armed, (c) of where the wardens walked and what they said and did, and (d) of where and how all relevant events occurred. In short, the facts of what happened are admissible;
>
> 2. However, counsel for Mr. Stietz may not characterize the wardens' conduct as trespassing, at least absent a further ruling by the Court; and
>
> 3. Further, counsel for Mr. Stietz may not argue that the Second Amendment permitted Mr. Stietz's conduct, or affords a legal defense here.

¶125 From March 11, 2014, to March 14, 2014, Stietz was tried before a jury. On March 14, 2014, at the jury instruction conference, it was determined (based in part on prior rulings)

15

that the jury would not receive Stietz's requested instructions regarding the Second Amendment, trespass, and self-defense.

¶126 While the charges filed against Stietz and considered by the jury included one count of first degree recklessly endangering safety and one count of negligent handling of a dangerous weapon, Stietz was also charged with one count of resisting an officer, use of a dangerous weapon, with respect to Warden Frost, one count of resisting an officer, use of a dangerous weapon, with respect to Warden Webster, one count of intentionally pointing a firearm at a law enforcement officer with respect to Warden Frost, and one count of intentionally pointing a firearm at a law enforcement officer with respect to Warden Webster.

¶127 Later that day, the jury returned its verdict. The jury found Stietz not guilty of first degree recklessly endangering safety; not guilty of resisting an officer, use of a dangerous weapon with respect to Warden Frost; guilty of resisting an officer, use of a dangerous weapon with respect to Warden Webster; not guilty of negligent handling of a weapon; not guilty of intentionally pointing a firearm at a law enforcement officer with respect to Warden Frost; and guilty of intentionally pointing a firearm at a law enforcement officer with respect to Warden Webster.

¶128 On March 24, 2014, Stietz filed a motion for acquittal or a new trial. On May 21, 2014, the court denied the motion. On May 28, 2014, the circuit court sentenced Stietz to one year of initial confinement and three years of extended supervision

16

on the charge of intentionally pointing a firearm at a law enforcement officer. The court withheld sentence on the resisting an officer, use of a dangerous weapon charge, placing Stietz on probation for two years consecutive to the sentence on the other count. A judgment of conviction was entered, and Stietz filed a notice of intent to pursue postconviction relief the same day.

¶129 On April 14, 2016, the court of appeals affirmed Stietz's judgment of conviction. State v. Stietz, No. 2014AP2701-CR, unpublished slip op. (Wis. Ct. App. Apr. 14, 2016) (per curiam). On May 16, 2016, Stietz filed a petition for review in this court. On October 11, 2016, this court granted the petition.

III

¶130 The issues raised on appeal pertain largely to whether the circuit court erred in not providing certain jury instructions requested by Stietz.

> A circuit court has broad discretion in deciding whether to give a requested jury instruction. However, a circuit court must exercise its discretion in order "to fully and fairly inform the jury of the rules of law applicable to the case and to assist the jury in making a reasonable analysis of the evidence."

State v. Coleman, 206 Wis. 2d 199, 212, 556 N.W.2d 701 (1996) (citation omitted) (quoting State v. Vick, 104 Wis. 2d 678, 690, 312 N.W.2d 489 (1981)). Even if the circuit court errs, "an 'erroneous jury instruction warrants reversal and a new trial only if the error was prejudicial.'" Kochanski v. Speedway SuperAmerica, LLC, 2014 WI 72, ¶11, 356 Wis. 2d 1, 850

17

N.W.2d 160 (quoting <u>Fischer v. Ganju</u>, 168 Wis. 2d 834, 849, 485 N.W.2d 10 (1992)). Importantly, "an error relating to the giving or refusing to give an instruction is not prejudicial if it appears that the result would not be different had the error not occurred." <u>Id.</u> (quoting <u>Lutz v. Shelby Mut. Ins. Co.</u>, 70 Wis. 2d 743, 751, 235 N.W.2d 426 (1975)).

¶131 I first address the circuit court's decision not to instruct the jury on self-defense. I then address the circuit court's decision not to instruct the jury on trespass.

IV

¶132 Stietz argues that the circuit court should have instructed the jury that he was privileged to defend himself against the wardens under certain circumstances.

¶133 The pattern jury instruction on self-defense entitled "Privilege: Self-Defense: Force Less Than That Likely to Cause Death or Great Bodily Harm——[Wis. Stat.] § 939.48" reads in part as follows:

> Self-defense is an issue in this case. The law of self-defense allows the defendant to threaten or intentionally use force against another only if:
>
> - the defendant believed that there was an actual or imminent unlawful interference with the defendant's person; and,
>
> - the defendant believed that the amount of force the defendant used or threatened to use was necessary to prevent or terminate the interference; and
>
> - the defendant's beliefs were reasonable.
>
> Determining Whether Beliefs Were Reasonable

18

A belief may be reasonable even though mistaken. In determining whether the defendant's beliefs were reasonable, the standard is what a person of ordinary intelligence and prudence would have believed in the defendant's position under the circumstances that existed at the time of the alleged offense. The reasonableness of the defendant's beliefs must be determined from the standpoint of the defendant at the time of the defendant's acts and not from the viewpoint of the jury now.

Wis JI——Criminal 800 (footnotes omitted). Wisconsin Stat. § 939.48(1) (the statute referenced by the instruction) itself states:

A person is privileged to threaten or intentionally use force against another for the purpose of preventing or terminating what the person reasonably believes to be an unlawful interference with his or her person by such other person. The actor may intentionally use only such force or threat thereof as the actor reasonably believes is necessary to prevent or terminate the interference. The actor may not intentionally use force which is intended or likely to cause death or great bodily harm unless the actor reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself.

§ 939.48(1).[7]

¶134 As an initial matter, it was Stietz's burden to place self-defense in issue. See Head, 255 Wis. 2d 194, ¶111. "[I]f, before trial, the defendant proffers 'some' evidence to support her defense theory and if that evidence, viewed most favorably to her, would allow a jury to conclude that her theory was not disproved beyond a reasonable doubt, the factual basis for her

---

[7] Stietz requested Wis JI-Criminal 800 as well as "alternative self-defense formulations." Stietz does not develop arguments suggesting that any differences between these formulations are material for purposes of this appeal.

19

defense theory has been satisfied." Id., ¶115 (emphasis added). On the other hand:

> [T]he standard for giving a jury instruction on self-defense may, in some circumstances, be higher than the standard for admitting self-defense evidence at trial, because a defendant's claim of self-defense may be so thoroughly discredited by the end of the trial that no reasonable jury could conclude that the state had not disproved it.

Id. (first emphasis added).

¶135 Stietz argues that he is entitled to a self-defense instruction because the evidence viewed in the light most favorable to him showed that he had been having problems with trespassers; that on November 25, 2012, Stietz had been looking for trespassers; and that Stietz in fact encountered two "strangers dressed in blaze orange trespassing on his land" who "demanded his rifle." Stietz claims that at the time the wardens ordered him to disarm "it was reasonable for him to infer" based on the available information that the wardens were "illegally trespassing hunters." Stietz adds that the strangers forcibly obtained his weapon and that one of the strangers pointed a handgun at him. Under the circumstances, Stietz contends, self-defense was warranted.

¶136 Stietz's argument fails. Stietz's assertion of self-defense was "so thoroughly discredited" by the close of evidence "that no reasonable jury could conclude that the state had not disproved it." Id. As the State explains in its brief:

> It is undisputed that both wardens were wearing their issued uniforms: a "blaze orange" jacket; a DNR patch on the shoulder of each arm of the jacket; a DNR badge along either the middle zipper of the jacket or the left chest; and a "blaze orange" hat with a DNR patch.

20

The wardens did not carry long guns, which Warden Frost testified is "usually a give away as to us not being hunters." Further, Stietz's own testimony confirms that he heard one of the wardens say to him, "a Warden"; testimony self-evidently not negated by Stietz's contention that the statement was "kind of mumbled, not real loud." The circuit court correctly stated at the jury instruction conference that "[u]nder the circumstances, if [Stietz] didn't know [that Warden Frost and Warden Webster] were wardens, he should have, and he didn't have a right to self-defense against a police officer." See Wis JI——Criminal 800 ("In determining whether the defendant's beliefs were reasonable, the standard is what a person of ordinary intelligence and prudence would have believed in the defendant's position under the circumstances that existed at the time of the alleged offense.").

¶137 Nor does rejecting Stietz's claim of self-defense require this court or the circuit court to improperly weigh the evidence, as Stietz argues. As our case law makes clear, viewing evidence in the light most favorable to the defendant does not mean suspending one's disbelief to the point of absurdity. Cf. State v. Mendoza, 80 Wis. 2d 122, 153, 258 N.W.2d 260 (1977) ("Thus the question before us . . . is . . . whether a reasonable construction of the evidence will support the defendant's theory 'viewed in the most favorable light it will "reasonably admit of from the standpoint of the accused."'" (emphasis added) (quoting Ross v. State, 61 Wis. 2d 160, 172, 211 N.W.2d 827 (1973))). If "no reasonable

21

jury could conclude" on the evidence presented that the State had failed to disprove a claim of self-defense, a jury instruction is not warranted. Head, 255 Wis. 2d 194, ¶115; cf. Mendoza, 80 Wis. 2d at 152-53. To take one hypothetical raised by the circuit court below that is not at all far off from the facts of this case, if a defendant is pulled over by a uniformed police officer at night and resists the officer, he cannot simply invoke the magic words of "self-defense" to obtain the corresponding jury instruction. Here, the circuit court properly exercised its discretion in refusing to instruct the jury that Stietz might have been acting in self-defense, in light of the fact that Stietz's claim had been sufficiently "discredited." Head, 255 Wis. 2d 194, ¶115. If anything, the wardens seem to have been defending themselves.

¶138 Regardless, even assuming that the circuit court should have instructed Stietz's jury on self-defense, such error was patently harmless; there is no doubt that even absent the error the result would have been the same. See Kochanski, 356 Wis. 2d 1, ¶11. This becomes evident when one reviews the crimes of which Stietz was acquitted and the crimes of which Stietz was convicted, in light of the facts of the case.

¶139 The interaction between the three parties is divisible into two parts: (1) the initial struggle between Stietz and the two wardens over Stietz's rifle; and (2) the prolonged standoff between the three during which the wardens pointed firearms at Stietz and Stietz pointed his firearm at Warden Webster.

22

¶140 Stietz was <u>acquitted</u> of resisting Warden Frost and of pointing a weapon at Warden Frost but <u>convicted</u> of resisting Warden Webster and of pointing a weapon at Warden Webster. In other words, this means that the jury was unwilling to assign guilt to Stietz regarding the initial struggle over Stietz's rifle, but concluded that Stietz was guilty with regard to the prolonged standoff. This is hardly shocking, given that during this second period: (1) Stietz continued to point his handgun at Warden Webster even after, <u>by his own admission</u>, he knew that the two officers were wardens; and (2) Stietz refused to surrender his firearm for over half an hour, despite being in the presence of multiple additional clearly-identified law enforcement officers cajoling him to submit peacefully.

¶141 Critically, in order to have convicted Stietz of resisting Warden Webster, use of a dangerous weapon, in violation of Wis. Stat. § 946.41(1), and intentionally pointing a firearm at Warden Webster, in violation of Wis. Stat. § 941.20(1m)(b), the jury <u>had</u> to have found, as elements of the crimes, that Stietz <u>knew or had reason to know</u> that Warden Webster was a law enforcement officer. More specifically, the elements of the crime of resisting an officer are:

    1. The defendant resisted an officer. . . .

    2. The officer was doing an act in an official capacity. . . .

    3. The officer was acting with lawful authority. . . .

    4. <u>The defendant knew that (officer) was an officer acting in an official capacity and with lawful</u>

23

<u>authority</u> and that the defendant knew (his) (her) conduct would resist the officer.

Wis JI──Criminal 1765 (emphasis added).

¶142 The elements of the crime of intentionally pointing a firearm at a law enforcement officer are:

    1. The defendant pointed a firearm at or toward (name of victim). . . .

    2. The defendant pointed the firearm at or toward (name of victim) intentionally. . . .

    3. (Name of victim) was a law enforcement officer.

    4. (Name of victim) was acting in an official capacity.

    <u>5. The defendant knew or had reason to know that (name of victim) was a law enforcement officer.</u>

Wis JI──Criminal 1322A (emphasis added).

¶143 Consequently, even if the jury had been instructed regarding self-defense, it would not have made a difference. On the evidence presented, the jury rejected Stietz's claim that he did not know that Warden Webster was a warden and that Stietz's ignorance was justifiable. The jury's verdict makes clear that it carefully considered the evidence before it. Even assuming that omission of a self-defense jury instruction was error, this court should not upset that verdict for the purpose of providing an instruction that would not have had any effect.

¶144 Finally, Stietz could be read to argue that, aside from the discussion above, he had a right to defend himself against the wardens because they had no legal right to seize or disarm him. That is not the law. In <u>Hobson</u>, for example, this court abrogated the common law privilege "to forcibly resist an

24

unlawful arrest in the absence of unreasonable force." State v. Hobson, 218 Wis. 2d 350, 353, 577 N.W.2d 825 (1998). We "adopt[ed] the conclusion" of another state supreme court that had reasoned in part:

> [T]he legality of a peaceful arrest should be determined by courts of law and not through a trial by battle in the streets. It is not too much to ask that one believing himself unlawfully arrested should submit to the office[r] and thereafter seek his legal remedies in court. Such a rule helps to relieve the threat of physical harm to officers who in good faith but mistakenly perform an arrest, as well as to minimize harm to innocent bystanders.

Id. at 379-80 (quoting Miller v. State, 462 P.2d 421, 427 (1969)). We also quoted Judge Learned Hand, who eloquently noted that "[t]he idea that you may resist peaceful arrest . . . because you are in debate about whether it is lawful or not, instead of going to the authorities which can determine [lawfulness], . . . [is] not a blow for liberty but, on the contrary, a blow for attempted anarchy." Id. at 373 (alterations in original) (quoting Discussion of Model Penal Code (Tentative Draft No. 8), 35 A.L.I. Proc. 222, 254 (1958)). And, finally, we analogized to the Supreme Court's discussion in Walker v. City of Birmingham, where the Court referenced a "rule of law . . . reflect[ing] a belief that in the fair administration of justice no man can be judge in his own case, however exalted his station, however righteous his motives, and irrespective of his race, color, politics, or religion." Id. at 378 (quoting Walker v. City of Birmingham, 388 U.S. 307, 320-21 (1967)).

25

¶145 Here, Warden Frost and Warden Webster were not even arresting Stietz. As will be discussed in greater detail below, they were lawfully investigating potential hunting violations. For their own safety and for the purpose of ensuring compliance with applicable laws, the wardens peaceably asked or ordered Stietz to disarm. Stietz should have surrendered his firearm rather than resist this demand, <u>lawful or not</u>. When he failed to respond to the verbal instruction, unjustifiably intensifying the pressures of the situation and the wardens' concerns for safety, the wardens reasonably attempted to obtain the weapon against Stietz's will. Once again, Stietz had no right to forcibly resist the actions of the wardens.

¶146 Much as some might wish it to be so, we are no longer living in the Wild West. Disputes between law enforcement officers and the citizens they serve are resolved in court. No matter how in the right they may be, members of the general public have no authority to take matters into their own hands. Law enforcement officers make mistakes of law or fact every day. There are judicial remedies for such errors, such as suppression or even an independent lawsuit. Stietz could have availed himself of such remedies rather than risking his own life and

the lives of Warden Frost and Warden Webster. His argument that he was entitled to forcibly resist must be rejected.[8]

V

¶147 Stietz next argues that the circuit court erred in declining to instruct the jury regarding the issue of whether the wardens might have been trespassing on Stietz's property. According to Stietz, the issue is relevant because if the wardens were trespassing, he argues, they were not acting "in an official capacity" and "with lawful authority," one or both of which are elements of the crimes of which Stietz was convicted. See Wis. Stat. § 946.41(1) ("Except as provided in subs. (2m) and (2r), whoever knowingly resists or obstructs an officer while such officer is doing any act in an official capacity and with lawful authority is guilty of a Class A misdemeanor." (emphasis added)); Wis. Stat. § 941.20(1m)(b) ("Whoever intentionally points a firearm at or towards a law enforcement officer, a fire fighter, an emergency medical technician, a first responder, an ambulance driver, or a commission warden who

---

[8] Stietz also asserts that the wardens' actions "violated Stietz' Second Amendment rights and precludes his prosecution." But Stietz does little more than cite the Second Amendment and its counterpart in the Wisconsin Constitution. I agree with the State that Stietz's argument is undeveloped. Stietz undeniably possesses important constitutional rights to keep and bear arms. But "[l]ike most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." District of Columbia v. Heller, 554 U.S. 570, 626 (2008). Stietz must do more than simply cite a constitutional provision and wait for the court to formulate arguments on his behalf.

27

is acting in an official capacity and who the person knows or has reason to know is a law enforcement officer, a fire fighter, an emergency medical technician, a first responder, an ambulance driver, or a commission warden is guilty of a Class H felony." (emphasis added)).

¶148 Stietz's argument is meritless. It should be noted at the outset that the court of appeals below concluded that the entry was constitutional under the open fields doctrine. Stietz, unpublished slip op., ¶¶15-18; see also, e.g., Florida v. Jardines, 569 U.S. ___, 133 S. Ct. 1409, 1414 (2013) ("The Fourth Amendment does not, therefore, prevent all investigations conducted on private property; for example, an officer may (subject to [Katz v. United States, 389 U.S. 347 (1967)]) gather information in what we have called 'open fields'——even if those fields are privately owned——because such fields are not enumerated in the Amendment's text."). Stietz does not appear to contest this conclusion (though he does argue that the wardens lacked reasonable suspicion to enter the property, a matter discussed below).

¶149 Further, a number of statutes establish that the wardens possessed statutory authority to enter Stietz's property. For instance, Wis. Stat. § 23.10(1) provides in part:

> The department of natural resources shall secure the enforcement of all laws which it is required to administer . . . . The persons appointed by said department to exercise and perform the powers and duties heretofore conferred and imposed upon deputy fish and game wardens, shall be known as conservation wardens.

§ 23.10(1) (emphasis added).

28

¶150 Next, Wis. Stat. § 29.921, entitled "Warrants; arrests; police powers," provides in part:

> The department and its wardens[9] . . . may arrest, with or without a warrant, any person detected in the actual violation, or whom the officer has probable cause to believe is guilty of a violation of any of the laws cited in this subsection,[10] whether the violation is punishable by criminal penalties or by forfeiture, and may take the person before any court in the county where the offense was committed and make a proper complaint. For the purpose of enforcing any of the laws cited in this subsection, any officer may stop and board any boat and stop any vehicle, if the officer reasonably suspects there is a violation of those sections.

§ 29.921(1).

¶151 Wisconsin Stat. § 29.924, entitled "Investigations; searches," provides in part that "[t]he department and its wardens shall, upon receiving notice or information of the violation of any laws cited in s. 29.921(1), as soon as possible make a thorough investigation and institute proceedings if the evidence warrants it." § 29.924(1). And Wis. Stat. § 29.931 orders "[t]he department and its wardens" to "seize and confiscate any wild animal, carcass or plant caught, killed,

---

[9] See Wis. Stat. § 24.01 ("In chs. 23 to 29, unless the context requires otherwise or unless otherwise defined: . . . (3) 'Department' means department of natural resources. . . . (11) 'Warden' means conservation warden, and includes county, special and deputy conservation wardens.").

[10] The subsection references "any law enumerated in ss. 23.50(1), 167.31, 346.19, 940.24, 941.20, 948.60, 948.605 and 948.61." Wis. Stat. § 29.921(1). Wisconsin Stat. § 23.50(1) in turn references, among other things, "violations of . . . this chapter, and chs. 26 to 31." This would include Wis. Stat. ch. 23 ("Conservation") and Wis. Stat. ch. 29 ("Wild animals and plants").

taken, had in possession or under control, sold or transported in violation of any of the laws for which the department and its wardens have enforcement authority under s. 29.921." § 29.931(1).

¶152 This court has already recognized that "[t]he State Conservation Commission and its deputies are given rather broad police powers in the enforcement of the fish and game laws of this state." State v. Leadbetter, 210 Wis. 327, 330, 246 N.W. 443 (1933).[11] There is much to commend the legislature's approach in this regard. The DNR is tasked with enforcing a targeted set of laws, the violation of which will often occur on private land. While wardens must of course act within constitutional constraints, the statutory limitations on their actions are relatively permissive and enable the DNR to

---

[11] The conservation commission preceded the Department of Natural Resources. See, e.g., Prefatory Note, 1997 Wis. Act 248.

30

effectively address violations of hunting and fishing laws, among others.[12]

¶153 In this case, the wardens possessed reasonable suspicion that hunting violations were occurring. On the last day of deer hunting season near the end of hunting hours, the wardens spotted a vehicle parked out in a field. Warden Webster thought the vehicle might be abandoned, whereas Warden Frost

---

[12] Stietz points to Wis. Stat. § 23.58(1), a provision in that chapter of the Wisconsin Statutes entitled "Conservation," which states in part that "an enforcing officer may stop a person in a public place for a reasonable period of time when the officer reasonably suspects that such person is committing, is about to commit or has committed a violation of" certain enumerated statutes. § 23.58(1) (emphasis added). Stietz argues that the wardens were not in a "public place." But the putative inapplicability of § 23.58(1) proves little. That subsection applies broadly to "enforcing officer[s]." Id. Unlike the statutes cited that apply specifically to "the department and its wardens," § 23.58(1) applies to, among others, "a person who has authority to act pursuant to a specific statute." See, e.g., State v. Iverson, 2015 WI 101, ¶41, 365 Wis. 2d 302, 871 N.W.2d 661 (state troopers). Thus, given that many different types of law enforcement officers fall within the terms § 23.58(1), the legislature may sensibly have wished to circumscribe the scope of the authority the subsection provides.

Stietz also suggests that Wis. Stat. § 29.924(5) supports his argument. That subsection reads as follows: "Access to Private Land. The department may, after making reasonable efforts to notify the owner or occupant, enter private lands to retrieve or diagnose dead or diseased wild animals and take actions reasonably necessary to prevent the spread of contagious disease in the wild animals." § 29.924(5). Those circumstances were not present here. But section 29.924(5) does not unambiguously purport to provide the only circumstances under which wardens may enter private land. Section 29.924(5) would appear to be required as an independent source of authority because the spread of contagion will not necessarily be tied to any legal violation on the part of a landowner.

31

thought the vehicle might have belonged to a hunter. Warden Frost's suspicions were confirmed when hunting-related items were spotted in the vehicle: an empty gun case, a camouflaged seat, and scent killer spray. By that time hunting hours were over. The wardens were entitled to investigate whether the individual to whom the car belonged was indeed engaged in illegal hunting.[13] As the jury's verdict suggests, the wardens were indeed acting in an official capacity and with lawful authority. The circuit court did not err in declining to instruct the jury regarding the law of trespass.[14]

¶154 In sum, Stietz's arguments on appeal should be rejected.[15]

VI

¶155 DNR wardens are tasked with the protection of the natural resources of this state and the enforcement of a special subset of our laws. See, e.g., Wis. Citizens Concerned for Cranes & Doves v. DNR, 2004 WI 40, ¶23, 270 Wis. 2d 318, 677

---

[13] The wardens were probably correct in thinking that illegal hunting was taking place. Stietz was found in "full camouflage" with blaze orange in his pocket and carrying two weapons. Numerous hunting-related items were found in his vehicle.

[14] As explained, the circuit court also barred Stietz from arguing that the wardens were trespassing, and Stietz objects to that ruling. For the reasons already stated, the circuit court's decision was not in error.

[15] Stietz characterizes many of the errors that occurred below as violating his constitutional right to present a defense. Assuming Stietz has correctly invoked the right, that invocation fails because Stietz's individual arguments, as shown, fail.

32

N.W.2d 612 ("This court has previously recognized that the DNR has broad authority as custodian of Wisconsin's wildlife to enact regulations that maintain a balance between conserving and exploiting the state's wildlife."). In order to catch offenders, DNR wardens must sometimes enter private lands; the element of surprise is critical to their unique law enforcement mission.

¶156 In this case, Warden Frost and Warden Webster entered Stietz's land and questioned Stietz to verify whether illegal hunting was taking place. Landowners and hunters alike depend on DNR wardens to engage in this type of activity. Many landowners do not have the resources to police their own land for illegal hunters. Nor would this be a desirable approach: if landowners policed their own land looking for trespassers (as Stietz was allegedly doing in this case), the result would be a chaotic free-for-all. The work of DNR wardens thus keeps both hunters and landowners safe. Unfortunately, the court hinders the ability of DNR wardens to act in the way they have traditionally been required to act.

¶157 As the circuit court noted, Stietz is fortunate that he was not shot when he drew his handgun on Warden Frost and Warden Webster. He is fortunate the wardens showed such incredible restraint. But a jury concluded on the evidence that Stietz was not blameless——that he should not have resisted Warden Webster and pointed a firearm at him. There is nothing unjust about the proceedings that occurred below; the circuit court was within its discretion in declining to instruct the

33

jury on self-defense and trespass.  Accordingly, I would reject Stietz's claims and affirm the decision of the court of appeals.

¶158 For the foregoing reasons, I respectfully dissent.

¶159 I am authorized to state that Justice MICHAEL J. GABLEMAN joins this opinion.